SCHARLETTE HOLDMAN, individually and on behalf of all persons similarly situated, Plaintiff-Appellant *v.* ANTONE OLIM, individually and as Superintendent of Prisons for the State of Hawaii; JOHN SMYTHE, individually and as Head of Security at Oahu State Prison; and MATRON JANE DOE, Defendants-Appellees.

NO. 5963

JULY 18, 1978

RICHARDSON, KOBAYASHI, OGATA, MENOR AND KIDWELL, JJ.

OPINION OF THE COURT BY KIDWELL, J.

Appellant, a woman visitor to Oahu State Prison, was not allowed to enter the prison when it was discovered she was not wearing a brassiere. In an action against appellees, prison officials, appellant sought an injunction, damages and declaratory relief, and appeals from dismissal of her action at the close of plaintiff's evidence. Appellees purported to act pursuant to a directive controlling the dress of visitors to the prison. Appellant contends that the directive was unconstitutional under both the federal and state constitutions because it discriminated on the basis of sex and infringed privacy interests and, as further ground of its invalidity, that it was not promulgated according to the standards of the Hawaii Administrative Procedure Act (HAPA). We affirm.

Appellant sought entry into the prison, all of the residents of which were male, to meet with an inmate.[1] She consented to a routine search of her person by a prison matron prior to entry. During the search, it was discovered and appellant admitted that she was not wearing a brassiere. Appellant was advised by the matron that she would not be permitted to enter unless she wore such an undergarment. The matron

---

[1] Appellant alleged that she was executive director of the American Civil Liberties Union of Hawaii and sought entry into the prison in that capacity. In this appeal, it has not been suggested that appellant was refused entry into the prison for any reason other than her dress and appellant has not asserted any visiting right or privilege based on her office or purpose. Other than assuming that the intended visit was for a nonobjectionable purpose, we have given no consideration to appellant's capacity or purpose. *Cf. Procunier v. Martinez*, 416 U.S. 396 (1974); *Houchins v. KQED, Inc.*, 98 S. Ct. 2588 (1978).

purported to follow a statement issued by the Acting Prison Administrator, which provided in pertinent part:

*INTERIM VISITING AND CONDUCT OF VISITORS*

\* \* \* \*

VISITORS WILL BE PROPERLY DRESSED. WOMEN VISITORS ARE ASKED TO BE FULLY CLOTHED, INCLUDING UNDERGARMENTS. PROVOCATIVE ATTIRE IS DISCOURAGED.

Appellant did not bring up a transcript of the proceedings below, and the record contains no exhibits other than copies of portions of the rules and regulations of the correction division of the State Department of Social Services and Housing. We are confined to the findings of facts entered by the trial court for the factual posture of this case. Although it is characterized as a "regulation or policy statement" in the findings of fact, the circumstances of the issuance of the statement quoted above are not disclosed by the record. It is undisputed that it lacked the force of law. Since it is before us as the instruction of higher authority to which the matron referred in denying appellant's entry into the prison, we think it is best characterized for the purposes of this opinion as a directive.

Appellant seeks declaratory and injunctive relief as well as money damages based upon the alleged deprivation of constitutional rights and the alleged subjection of appellant to emotional injury. In dismissing her complaint under Rule 41(b) H.R.Civ.P., the circuit court found that HAPA did not apply to the challenged directive, that there was no evidence that it was arbitrarily or capriciously issued, interpreted or applied to appellant by prison officials, and that appellant neither suffered sex discrimination nor was denied the right to privacy.

The primary thrust of appellant's argument to this court is that the directive on its face discriminates on the basis of sex. Appellant asserts that this discrimination is in violation of the equal protection clause of the Fourteenth Amendment and its counterpart in the Hawaii Constitution, Article 1, Section 4,

and of the Hawaii equal rights provision, Article 1, Section 21.

I

At the outset, we must recognize that appellant seeks to show discriminatory exercise of authority on the part of appellees by the single incident of appellant's exclusion. The record does not tell us whether a pattern of discrimination could be discerned in appellees' practices. For this, we might have to know whether male visitors were admitted with less onerous dress requirements. We might also have to know whether appellees interpreted the requirement of undergarments as including a brassiere in the case of other women visitors. We do not know appellant's personal physical characteristics and have no means of determining what differentiation was in fact practiced by appellees as among women visitors. These deficiencies in the record are troublesome. Nevertheless, appellees have raised no issue with respect to any failure of the record to show the differentiation in the treatment of prison visitôrs which appellant alleges. For the purposes of this case, we will consider the directive as sufficiently evidencing that the motivation underlying the directive was to effect the alleged differentiation and that such differentiation was in fact practiced in admitting visitors to the prison. *Cf. Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).

A challenge to a legislative classification as violative of the equal protection of the laws guaranteed by the Fourteenth Amendment of the United States Constitution is ordinarily resolved by inquiring whether a rational basis exists for the classification. *Nelson v. Miwa,* 56 Haw. 601, 546 P.2d 1005 (1976). But "this court has recognized that laws classifying on the basis of suspect categories or impinging upon fundamental rights expressly or impliedly granted by the Constitution are presumed to be unconstitutional unless the state shows compelling state interests which justify such classifications." *Nelson v. Miwa, supra* at 605, n.4. This court has not

dealt with a sex-based classification. In *Frontiero v. Richardson*, 411 U.S. 677 (1973), a plurality of the United States Supreme Court favored the inclusion of classifications based upon sex among those considered to be suspect for the purposes of the compelling state interest test. However, subsequent cases have made it clear that the current governing test under the Fourteenth Amendment is a standard intermediate between rational basis and strict scrutiny. "[C]lassifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren*, 429 U.S. 190, 197 (1976). Also see *Califano v. Goldfarb*, 430 U.S. 199, 209 (1977) and *Califano v. Webster*, 430 U.S. 313, 316-17 (1977).

Maintenance of order or control in a prison has been recognized to be an important, in fact a vital, governmental objective. *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 132 (1977), *Pell v. Procunier*, 417 U.S. 817, 823 (1974), *Procunier v. Martinez*, 416 U.S. 396, 412-13 (1974). The institutional consideration of internal security within the correction facilities is central to all correctional goals. *Pell v. Procunier*, *supra* at 823. Security considerations are sufficiently paramount in the administration of the prison to justify restrictions on the entry of outsiders for face-to-face contact with inmates. *Id.* at 827. Because of the essential need for security and the recognition that courts are ill-equipped to deal with matters of prison administration, wide-ranging deference is given to prison administrators in the exercise of their discretion. *Jones*, *supra* at 119, *Procunier v. Martinez*, *supra* at 405. In *Dothard v. Rawlinson*, 433 U.S. 321, 336 (1977), the mere presence of a woman as a guard in a "contact" position in a prison, under the conditions prevailing in the Alabama prison system, was regarded as "a real threat . . . to the basic control of the penitentiary and protection of its inmates".

Dress standards are intimately related to sexual attitudes. We do not express individual views of propriety by recognizing that the omission of a brassiere as a conventional article of women's clothing has been controversial and has been regarded as sexually provocative by some members of society.

Whether these attitudes were reflected in the prison population at the times relevant to this case could have been determined, if at all, only with great difficulty. The dress restrictions imposed upon women visitors by the directive derived their relation to prison security out of the assumption that these attitudes were present among the residents. Whether or not this assumption was correct, it is manifest that the directive was substantially related to the achievement of the important governmental objective of prison security and met the test under the Fourteenth Amendment.

II

Appellant's challenge to the directive under the state constitution requires separate consideration. Article I, Section 4 of the Hawaii Constitution declares that no person shall be "denied the equal protection of the laws, nor be denied the enjoyment of his civil rights or be discriminated against in the exercise thereof because of race, religion, sex or ancestry." Article I, Section 21, provides: "Equality of rights under the law shall not be denied or abridged by the State on account of sex." We are presented with two questions, either of which might be dispositive of the present case. We must first inquire whether the treatment appellant received denied to her the equal protection of the laws guaranteed by the Hawaii Constitution under a more stringent test than that applicable under the Fourteenth Amendment. If the more general guarantee of equal protection does not sustain appellant's claims, we must then inquire whether the specific guarantee of equality of rights under the law contained in Article I, Section 21, has been infringed.

It is open to this court, of course, to apply the more stringent test of compelling state interest to sex-based classifications in assessing their validity under the equal protection clause of the state constitution. *State v. Kaluna*, 55 Haw. 361, 520 P.2d 51 (1974). Appellant urges that we do so, arguing both from *Frontiero v. Richardson, supra,* and from the presence of sex with race, religion and ancestry as a category specifically named in Article I, Section 4.

We need not deal finally with that issue, and reserve it for future consideration, since we conclude that the compelling state interest test would be satisfied in this case if it were held to be applicable. It is apparent that the bar against sex-based classification is not absolute under the strictest test which has been applied under the Fourteenth Amendment. Even if a sex-based classification is deemed to be suspect and thus subject to stricter scrutiny under the equal protection clause of Article I, Section 4 than under the equal protection clause of the Fourteenth Amendment, such scrutiny involves consideration of whether the use of the suspect classification is necessary to protect a compelling state interest. We do not use these terms to define the limits to be drawn under the test of strict scrutiny, but only to indicate that state action which is challenged under the equal protection clause will survive strict scrutiny if the state demonstrates a sufficiently important interest and employs means which are closely enough drawn. *Cf. Buckley v. Valeo,* 424 U.S. 1, 25 (1976).

What we have said with respect to the relation of the directive to the maintenance of security in the prison is sufficient, we believe, to establish that the directive served a compelling state interest. Had the directive required conventional undergarments only in the cases of women visitors whose physical attributes without brassieres would create a reasonable risk that their attire would be regarded as sexually provocative by male residents of the prison, it would have been more difficult to challenge on its face. But the application of such a standard to prison visitors would, we believe, have created such intolerable difficulties in making subjective decisions at the prison door as to exclude its use as a less burdensome alternative. We consider that the avoidance of such difficulties justified application of uniform dress standards to all women visitors. Under the limited record before us, we cannot conclude that the directive fails the strict scrutiny test.

Survival under the strict scrutiny test places the directive beyond appellant's challenge under her asserted privacy right as well as under her right to equal protection under Article I, Section 4 of the State Constitution. *Roe v. Wade,*

410 U.S. 113, 155 (1973). It does not necessarily place the directive beyond challenge under the equal rights provision of Article I, Section 21.[2]

Article I, Section 21, is substantially identical with the proposed Equal Rights Amendment of the United States Constitution. It also is identical with, or closely resembles, equal rights provisions (ERAs) of the constitutions of a number of states. The standard of review to be applied under an ERA has not been clearly formulated by judicial decision. See note, Equal Rights Provisions: The Experience Under State Constitutions, 65 Calif. L. Rev. 1086 (1977). In a leading article, it has been said:

"The fundamental legal principle underlying the Equal Rights Amendment, then, is that the law must deal with particular attributes of individuals, not with a classification based on the broad and impermissible attribute of sex. This principle, however, does not preclude legislation (or other official action) which regulates, takes into account, or otherwise deals with a physical characteristic unique to one sex. In this situation it might be said that, in a certain sense, the individual obtains a benefit or is subject to a restriction because he or she belongs to one or the other sex. Thus a law relating to wet nurses would cover only women, and a law regulating the donation of sperm would restrict only men. Legislation of this kind does not, however, deny equal rights to the other sex. So long as the law deals only with a characteristic found in all (or some) women but *no* men, or in all (or some) men but *no* women, it does not ignore individual characteristics found in both sexes in favor of an average based on one sex. Hence such legislation does not, without more, violate the basic principle of the Equal Rights Amendment."

Brown, Emerson, Falk and Freedman, The Equal Rights

---

[2] By guaranteeing that "equality of rights under the law shall not be denied or abridged by the State on account of sex", Article I, Section 21 embraces the guarantee of Article I, Section 4 that "no person . . . shall be denied the enjoyment of his civil rights or be discriminated against in the exercise thereof because of . . . sex . . . ." Accordingly, we direct our attention only to Article I, Section 21.

Amendment: A Constitutional Basis for Equal Rights for Women, 80 Yale L.J. 871, 873 (1971).

In seeking an appropriate standard of review where sex-based classification is challenged under an ERA, so far as we are aware, the courts of only one jurisdiction have considered directly the extent to which a physical characteristic unique to one sex may be taken into account. The Washington Supreme Court, in declaring broadly that the Washington ERA forbids discrimination based on sex which would be held permissible under the rational relationship and strict scrutiny tests, pointed out that the sex discriminatory regulation of high school athletics which was before it did not involve the above suggested exception of dissimilar treatment on account of a characteristic unique to one sex. *Darrin v. Gould,* 540 P.2d 882, 890, n.8 (Wash. 1975). Unless we are to attempt in this case to define the standard of review required under Hawaii's ERA, no purpose will be served by analysis of the considerable body of decisions which fall short of dealing with that question. See, generally, *Opinion of the Justices,* 371 N.E.2d 426 (Mass. 1977). Compare *General Electric Co. v. Gilbert,* 429 U.S. 125 (1976). We have concluded that the treatment of which appellant complains withstands the test of strict scrutiny by reason of a compelling State interest. We are not prepared to hold in this case that, if a more stringent test should be applied under Article I, Section 21, the prohibition of that section is so absolute that it is not subject to the exception for physical characteristics unique to only one sex.

The present appeal is before us on a limited record. Upon this record it does not appear that the directive should be held to be facially or in application violative of the equal rights provisions of the state constitution. We think it is clear that the directive takes into account a physical characteristic which is possessed uniquely by women visitors to the prison. A less drastic alternative means of attaining the legitimate purpose of the directive has not been suggested, nor is it suggested that the directive is a subterfuge employed to attain an illegitimate objective. We do not decide what standard of review should be applied to an equal rights claim. Nevertheless, in the narrow focus of this case, we find that

the equal rights challenge has not been sustained.

### III

Appellant's final contention is that the directive was void because it was not promulgated as a rule in accordance with HRS Chapter 91, the Hawaii Administrative Procedure Act (HAPA). The term "rule" is defined in § 91-1(4) as "an agency statement of general or particular applicability and future effect that implements, interprets or prescribes law or policy, or describes the organization, procedure or practice requirements of any agency. The term does not include regulations concerning only the internal management of an agency and not affecting private rights of or procedures available to the public."

We assume, without deciding, that the directive under which appellant was denied entry to the prison so mandated standards of dress and limited the discretion of the prison staff as to conform to the inclusive definition of a "rule". However, Chapter 91 does not support appellant's attack on the directive if it was a regulation "concerning only the internal management of an agency and not affecting private rights of or procedures available to the public". What we have already said is sufficient to establish that no private right of or procedure available to the public is involved. The question remaining is whether the directive concerned only the internal management of the prison.

What constitutes matters of internal management is not clearly spelled out in HAPA itself or its legislative history. The legislative history that is available suggests that the "custodial management" of public property is primarily a matter of internal management. Standing Committee Report No. 8, 1961 *House Journal* 653, 656. It also suggests, as we noted in *Tai v. Chang,* 58 Haw. 386, 387, 570 P.2d 563, 564 (1977), that "matters relating to the operation and management of . . . penal [and] correctional . . . institutions" are primarily matters of internal management.

We think that the internal management of an agency necessarily includes the custodial management of public

property entrusted to the agency. "The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Adderley v. Florida,* 385 U.S. 39, 47 (1966). Regulation of the access of individuals to a public facility under the custody of an agency, at least where imposed for the security of the facility, thus concerns the internal management of the agency. In *Cafeteria and Restaurant Workers Union v. McElroy,* 284 F.2d 173 (D.D. Cir. 1960), *aff'd. on other grounds,* 367 U.S. 886 (1961), the court dealt with rules for admission to a Naval installation, which had been challenged for lack of publication in accordance with the federal Administrative Procedure Act. The Act required publication "[e]xcept to the extent that there is involved (1) any function of the United States requiring secrecy in the public interest or (2) any matter relating solely to the internal management of an agency." 60 Stat. 238 (1946), § 3. Insofar as the particular regulation applied to the Naval installation involved, the secrecy exception was held applicable. The court went on to hold that the internal management exception was also applicable.

"Furthermore the provision of the Act to which we have referred excepts from publication 'any matter relating solely to the internal management of an agency'. In so far as these regulations prescribe the authority of the commanding officer over an installation such as the Gun Factory, they relate to the internal management of the Navy." 284 F.2d at 179.

Section 91-1(4) confines the exception to regulations concerning "only" the internal management of the agency. Upon the record before us, the directive has no perceivable relation to any matter other than the internal condition and security of the prison and is, in our opinion, within the exception.

We conclude that appellant's action was properly dismissed. The judgment is affirmed.

*Steven E. Kroll,* for plaintiff-appellant.

*Charlotte E. Libman,* Deputy Attorney General, State of Hawaii, for defendants-appellees.