STATE OF HAWAII, Plaintiff-Appellee, *v.* ANDREW CHRIS BAYAOA, Defendant-Appellant

NO. 7968

(CRIMINAL NO. 54091)

DECEMBER 30, 1982

RICHARDSON, C.J., LUM, NAKAMURA, JJ.,
AND RETIRED JUSTICES OGATA AND MENOR,
ASSIGNED TEMPORARILY

22

OPINION OF THE COURT BY RICHARDSON, C.J.

Appellant, a prison inmate, was convicted of promoting prison contraband on the basis of evidence obtained in a strip search. Appellant contends the search and subsequent seizure of the contraband violated his constitutional rights as guaran-

teed by the fourth amendment of the United States Constitution and article I, § 7 of the Hawaii Constitution. We do not agree, and thus affirm appellant's conviction.

. I.

On December 14, 1979, appellant was an inmate in the Hawaii State Prison. At about 5:45 p.m., he was standing in front of one of the dorms on the ground floor of the prison, an area under the supervision of Sergeant William Taylor, a corrections officer. Sergeant Taylor observed appellant talking to another inmate who was inside the dorm, a large room enclosed by barred doors. Taylor then saw appellant stick his arm through the bars and pull out a small white packet resembling a piece of an envelope.

Sergeant Taylor testified he then asked appellant to approach him, but that appellant instead turned and ran up the stairs to the second floor. Taylor radioed the guard patrolling the second floor, Officer Jerry Roberts, who called out to appellant to stop. When appellant backed away from Roberts and started to pull something out of his pocket, Roberts grabbed him in a bear hug, picked him up, and carried him into the maximum security unit a few feet away.

Officer Roberts then told appellant to undress. After appellant had done so, Roberts searched his pants pockets where he found the white packet. Opening the packet, he discovered two marijuana cigarettes and two packs of rolling paper.

At a pretrial hearing,[1] appellant moved to suppress the evidence discovered in the strip search, alleging that there was no probable cause for the search and that the warrantless

---

[1] In its Answering Brief, the State contends appellant's motion to suppress should have been dismissed since it was filed 70 days after he had been arraigned, and under HRPP Rule 12(c), "[p]retrial motions and requests must be made within 21 days after arraignment unless the court otherwise directs." A similar situation existed in State v. Melear, 63 Haw. 488, 630 P.2d 619 (1981), where we stated: "We expect compliance with Rule 12(c) .... The record reflects the motions were not made within the allotted time period. Thus, the motions should have been considered untimely." *Id.* at 490 n.3,

search and seizure violated his fourth amendment rights. This motion was denied, and appellant was subsequently found guilty of violating HRS § 710-1022, promoting prison contraband in the first degree.

## II.

In deciding whether the strip search of appellant and the accompanying initial seizure of the packet were unconstitutional, we start with the oft-quoted statement that "[t]here is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell,* 418 U.S. 539, 555-56 (1974). The United States Supreme Court has drawn, however, a large distinction between the constitutional rights of prison inmates and those of everyone else. *See, e.g., Bell v. Wolfish,* 441 U.S. 520, 545-48 (1979); *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125-26, 129-30 (1977); *Pell v. Procunier,* 417 U.S. 817, 822-23 (1974). As the Court stated in *Jones, supra:*

> Prisons, it is obvious, differ in numerous respects from free society. They, to begin with, are populated, involuntarily, by people who have been found to have violated one or more of the criminal laws established by society for its orderly governance. In seeking a "mutual accommodation between institutional needs and objectives [of prisons] and the provisions of the Constitution that are of general application," . . . this Court has repeatedly recognized the need for major restrictions on a prisoner's rights.

433 U.S. at 129 (citations omitted).

---

630 P.2d at 622. In the present case, there were mitigating circumstances which prevented strict compliance with the rule, since defense counsel was appointed 23 days after appellant's arraignment. Nonetheless, a good faith effort to comply with the spirit if not the letter of Rule 12(c) would seem to require that the motion have been filed sooner than the seven weeks it took following defense counsel's appointment. Because of our decision on the merits of this case, however, we need not decide whether the trial court should have deemed appellant's suppression motion untimely and what result should have followed therefrom.

One of the more notable of these "restrictions" lies in the fourth amendment area. The Supreme Court's latest pronouncements on the fourth amendment rights of prisoners occurred in *Bell v. Wolfish,* 441 U.S. 520 (1979). There, a majority of the Court upheld a prison rule which required all prison inmates and pretrial detainees[2] to strip and expose their body cavities for visual inspection following "contact visits" with outsiders. *Id.* at 558. Although noting at the outset that "this practice instinctively gives us the most pause," *id.,* the Court concluded such searches were reasonable after considering "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted," *id.* at 559. The majority opinion did not say prison inmates have absolutely no fourth amendment rights, *see id.* at 558, a position we would be hesitant to embrace.[3] On the other hand, the Court did say: "[W]e deal here with the question whether visual body-cavity inspection . . . can *ever* be conducted on less than probable cause. Balancing the significant and legitimate security interests of the institution against the privacy interests of the inmates, we conclude that they can." *Id.* at 560.

---

[2] The majority opinion did not make any critical distinction between prison inmates and pretrial detainees — *i.e.,* persons charged with a crime but not yet tried — for purposes of evaluating the alleged constitutional infringements. The dissenting Justices in *Wolfish,* however, believed that detainees must be given greater constitutional protection than convicted inmates. *See* 441 U.S. at 568 (Marshall, J., dissenting); *id.* at 579 *passim* (Stevens, J., dissenting). *Accord: The Supreme Court, 1978 Term,* 93 Harv. L. Rev. 60, 104-05 (1979). We likewise believe that, at least with regard to the fourth amendment, the rights of persons not yet convicted of crimes must be more closely scrutinized than the rights of prisoners. *See generally* State v. Clark, 65 Haw. 488, 498 n.11, 654 P.2d 355, 362 (1982) (distinguishing pre-incarceration searches of arrestees from those of prisoners entering the main prison).

[3] This hesitancy is shared by most other courts, which have ruled that prisoners are not completely devoid of fourth amendment protection. *See, e.g.,* United States v. Hinckley, 672 F.2d 115, 128-29 (D.C. Cir. 1982); United States v. Lilly, 576 F.2d 1240, 1244 (5th Cir. 1978); United States v. Stumes, 549 F.2d 831, 832 (8th Cir. 1977); Bonner v. Coughlin, 517 F.2d 1311, 1316-17 (7th Cir. 1975), *modified en banc,* 545 F.2d 565 (1976), *cert. denied,* 435 U.S. 932 (1978); United States v. Savage, 482 F.2d 1371, 1372 (9th Cir. 1973), *cert. denied,* 415 U.S. 932 (1974); State v. Nason, 433 A.2d 424, 427 (Me. 1981).

We realize that this holding in *Wolfish* represents the view of a bare majority of the Supreme Court,[4] and is a view which has been the target of some criticism.[5] We are also aware of our prerogative "to extend the protections of the Hawaii Bill of Rights beyond those of textually parallel provisions in the Federal Bill of Rights when logic and a sound regard for the purposes of those protections" so warrant. *State v. Kaluna,* 55 Haw. 361, 369, 520 P.2d 51, 58 (1974), *quoted in Huihui v. Shimoda,* 64 Haw. 527, 531, 644 P.2d 968, 971 (1982), and *State v. Miyasaki,* 62 Haw. 269, 281, 614 P.2d 915, 922 (1980).

We believe, however, that whether we should give greater protection under our state constitution than the Supreme Court gave the inmates in *Wolfish* under the federal one is irrelevant, since it is evident we do not have *Wolfish* facts before us in this appeal. In *Wolfish,* all prisoners who had had contact visits were subjected to a body cavity search, even though their conduct aroused absolutely no suspicion in the minds of the prison guards. *See* 441 U.S. at 558. Here, Sergeant Taylor testified that he observed appellant whispering to another inmate and receiving a small white packet which he quickly placed in his pants pocket. Taylor also testified that after calling out to appellant, appellant turned and ran away. Based on these facts and his own considerable experience in dealing with these matters,[6] Taylor concluded that appellant

---

[4] Justice Rehnquist's opinion for the Court was joined by Chief Justice Burger and Justices Stewart, White, and Blackmun. Justice Powell concurred in all parts of the majority's opinion except that part concerning the constitutionality of the body cavity searches. *Id.* at 563 (Powell, J., concurring in part and dissenting in part). Justices Marshall, Stevens, and Brennan dissented.

[5] *See, e.g.,* Whitman, *Constitutional Torts,* 79 Mich. L. Rev. 5, 60 n.267 (1980); Note, *Toward a Constitutional Definition of Punishment,* 80 Colum. L. Rev. 1667, 1668-70, 1682-85 (1980); *The Supreme Court, 1978 Term,* 93 Harv. L. Rev. 60, 104-08 (1979).

[6] Sergeant Taylor testified at the pretrial suppression hearing that in his five years as a prison guard, he had seen some twenty similar occurrences in which inmates were suspected of concealing contraband, and that contraband was in fact found in each of those occurrences. Such facts are relevant in determining the reasonableness of the instant search; as the United States Supreme Court ruled in an analogous border search case: "In all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." United States v. Brignoni-Ponce, 422 U.S. 873, 885 (1975) (citing Terry v. Ohio, 392 U.S. 1, 27 (1968)).

was concealing contraband, a conclusion which culminated in Officer Roberts' strip search of appellant.

Clearly, these facts reach a much higher level of "cause" than do the ones in *Wolfish*.[7] Whether these facts constitute "probable" cause we need not decide, for it has become accepted by apparently every jurisdiction to consider this issue that probable cause is not necessary to conduct searches in prisons. *See, e.g., Bell v. Wolfish,* 441 U.S. at 560; *United States v. York,* 578 F.2d 1036, 1041 (5th Cir. 1978), *cert. denied,* 439 U.S. 1005 (1978); *Daughtery v. Harris,* 476 F.2d 292, 294-95 (10th Cir. 1973), *cert. denied,* 414 U.S. 872 (1973); *In re Alan R.,* 132 Cal. App. 3d 601, 604-05, 183 Cal. Rptr. 325, 327 (Ct. App. 1982); *Thomas v. State,* 285 Md. 458, 468, 404 A.2d 257, 263 (1979); *Marrero v. Commonwealth,* 222 Va. 754, 757, 284 S.E.2d 809, 810-11 (1981).[8] We believe this position to be a sound one, given the unique and compelling need of prisons to preserve order and security within their walls. As we observed in *Holdman v. Olim:*

> Maintenance of order or control in a prison has been recognized to be an important, in fact a vital, governmental objective. . . . The institutional consideration of internal security within the correction facilities is central to all correctional goals. . . . Because of the essential need for security and the recognition that courts are ill-equipped to deal with matters of prison administration, wide-ranging deference is given to prison administrators in the exercise of their discretion.

59 Haw. 346, 350, 581 P.2d 1164, 1167 (1978) (citations omitted); *accord: State v. Martinez,* 59 Haw. 366, 368-71, 580 P.2d 1282, 1284-86 (1978); *see generally State v. McCray,* 267 Md.

---

[7] They are also not as "offensive" as the facts in *Wolfish,* given that they center around a strip search as opposed to a body cavity search, the latter constituting the most objectionable of searches. *See generally* State v. Merjil, 65 Haw. 601, 603-04, 655 P.2d 864, 867 (1982) (border body cavity search); State v. Clark, 65 Haw. at 492-93 nn. 7 & 8, 654 P.2d at 359 (1982).

[8] These same courts have ruled that search warrants are likewise not necessary to conduct prison searches and seizures. *See* cases cited *supra.*

111, 134-44, 297 A.2d 265, 277-82 (1972) (discussing the traditional reluctance of courts to review the decisions and actions of prison officials).

But it is important that this "wide-ranging deference" not amount to a total abdication of our power of judicial review, however, for that would bring with it an unacceptably high potential for abuse. *See United States v. Hinckley,* 672 F.2d 115, 129 (D.C. Cir. 1982); *United States v. Lilly,* 576 F.2d 1240, 1244-46 (5th Cir. 1978); Giannelli & Gilligan, *Prison Searches and Seizures: "Locking" the Fourth Amendment out of Correctional Facilities,* 62 Va. L. Rev. 1045, 1068-69 (1976). Thus, we hold that in order to conduct the more intrusive body searches such as strip searches in non-emergency, non-contact visit situations, prison officials must have a reasonable basis to conclude that contraband is being concealed by inmates on their person. Relying on such a basis, they may conduct the search in a reasonable, non-oppressive manner.[9]

Given the possibility that appellant Bayaoa may have concealed contraband on his person during his flight and subsequent apprehension, we cannot say the strip search of appellant was unreasonable. It was not arbitrary or capricious; it was neither meant to harass nor motivated by malice. It was, in fact, based on Sergeant Taylor's strong suspicion that appellant was in possession of contraband. The search of appellant was thus more than an act of discretion — it was an act of duty, and we hold that the State has met its burden of proving that act to be reasonable under the circumstances.

---

[9] Although the case before this court concerns only a search of an inmate's person, we note that there is a strong judicial consensus that random, unannounced, warrantless searches of inmate living areas — conducted without probable or even reasonable cause to believe contraband will be found — are constitutionally permissible. *See, e.g.,* Bell v. Wolfish, 441 U.S. at 555-57; United States v. Hitchcock, 467 F.2d 1107, 1108 (9th Cir. 1972) (per curiam), *cert. denied,* 410 U.S. 916 (1973); Moore v. People, 171 Colo. 338, 342-43, 467 P.2d 50, 52 (1970); Marrero v. Commonwealth, 222 Va. at 757, 284 S.E.2d at 811.

### III.

Having concluded that the strip search of appellant and the ancillary seizure of the packet were constitutional, we next address the question whether the subsequent warrantless examination of the packet's contents was likewise lawful. Appellant contends that once the prison guards assumed exclusive control of the packet, there were no exigent circumstances which justified the opening of the packet without a warrant.

A similar contention was made by the appellee in *State v. Custodio,* 62 Haw. 1, 607 P.2d 1048 (1980). There, a body cavity search conducted by a prison matron upon the appellee, a female visitor to the prison, had resulted in the discovery of a balloon secreted in the appellee's vagina. The balloon was opaque and thus its contents, as in this case, were not visible. *Id.* at 5 n.4, 607 P.2d at 1051. It was nonetheless opened without a warrant, and appellee claimed this act violated her fourth amendment rights.

We employed a two-pronged test to determine whether the search infringed upon the appellee's "legitimate expectations of privacy": first, whether the individual exhibited an actual expectation of privacy; and second, whether that expectation was one society was prepared to acknowledge as reasonable. *Id.* at 8, 607 P.2d at 1052-53 (citing *Katz v. United States,* 389 U.S. 347, 361 (1967) (Harlan, J., concurring)). We held that, although the appellee's subjective expectation of privacy in articles hidden in her vagina was justifiable, such an expectation was not one that society would consider reasonable, given the "compelling governmental interests" in "maintaining order and control in prison facilities." *Id.* at 9, 607 P.2d at 1053 (citations omitted). We thus concluded that the warrantless examination of the balloon violated neither the fourth amendment nor our state constitutional equivalent. *Id.* at 10, 607 P.2d at 1054.

The conclusion in *Custodio* directs us to the result we reach here: the examination of the seized packet did not violate the fourth amendment's proscription against unreasonable searches and seizures. For even if we were to assume appellant's actual expectation of privacy in a packet placed in his

pants pocket was a justifiable one, and that assumption is tenuous given the prison setting, such an expectation is not one which we feel society is prepared to recognize as legitimate. Ensuring prison security and control was the basis for the decision in *Custodio, supra,* and such a state interest is even more compelling when applied to searches of prison inmates as opposed to prison visitors.[10] "Smuggling of money, drugs, weapons and other contraband is all too common an occurrence" in prisons, *Bell v. Wolfish,* 441 U.S. at 559, and prison officials realize that packets and other containers are often used to conceal such contraband. *See State v. Custodio,* 62 Haw. at 9, 607 P.2d at 1053. We thus conclude that the need to maintain internal security in prisons outweighs the reasonable expectations of privacy, if any, prisoners have in closed containers,[11] and that the opening of the packet in this case did not violate appellant's fourth amendment rights.[12]

---

[10] In State v. Martinez, another case involving a strip search of a prison visitor, we implicitly acknowledged that a prison inmate's rights are weaker than a prison visitor's when we stated: "Without suggesting that the constitutional protections of prison visitors may not exceed those enjoyed by prison inmates, we consider that an individual who seeks entry into a prison in a purely personal capacity may not claim immunity from security measures which are reasonable as applied to the prison inmates." 59 Haw. at 371, 580 P.2d at 1286 (citation omitted).

[11] We must emphasize that this rule applies only with respect to any fourth amendment rights prisoners may have in closed containers; it is not intended to apply to the opening of prisoners' mail, which implicates the first amendment's free speech guarantee as well as the inmates' constitutional right of access to counsel and the courts. *See generally* Procunier v. Martinez, 416 U.S. 396, 404-19 (1973) (first amendment); Adams v. Carlson, 488 F.2d 619, 629-32 (7th Cir. 1973) (right of access to counsel and the courts).

[12] Besides citing the fourth amendment and its Hawaii state constitutional equivalent, art. I, § 7, appellant cites Haw. Const. art. I, § 6, which provides in part: "The right of the people to privacy is recognized and shall not be infringed without a showing of compelling state interest." Although we have not yet precisely delineated the boundaries of this privacy right, we do not believe this is the proper case to do so, given the fact it involves prisons and prison inmates. For just as an individual's fourth amendment right to be free from unreasonable searches and seizures is severely curtailed upon his or her passing through the prison gates, so too is that person's right of privacy —

## IV.

This decision should not be construed as giving carte blanche to prison administrators and employees in their treatment of prisoners. Not all searches and seizures which occur inside prison walls automatically fall outside the proscriptions of the fourth amendment. As with other search and seizure cases, the burden will remain on the State to show that the alleged governmental intrusion is justified by a legitimate governmental interest, such as preserving the institutional security of our prison system. Where prison officials act capriciously, maliciously — in effect, unreasonably, we will not hesitate to hold them accountable to constitutional mandates. This not being such a case, however, we uphold the search and seizure and affirm appellant's conviction.

*June Y. Inouye* and *Keith M. Kiuchi,* Deputy Public Defenders, on the brief for defendant-appellant.

*Wesley T. Kan,* Deputy Prosecuting Attorney, on the brief for plaintiff-appellee.

---

whether that right is constitutionally expressed or implied — drastically diminished. *See, e.g.,* Lanza v. New York, 370 U.S. 139, 143 (1962); Bonner v. Coughlin, 517 F.2d at 1316-17; People v. Jones, 19 Cal. App. 3d 437, 449, 96 Cal. Rptr. 795, 802 (Ct. App. 1971). *But see generally* Singer, *Privacy, Autonomy, and Dignity in the Prison: A Preliminary Inquiry Concerning Constitutional Aspects of the Degradation Process in Our Prisons,* 21 Buffalo L. Rev. 669 (1972) (advocating a constitutional right of privacy for prison inmates). Even assuming, however, Haw. Const. art. I, § 6 applies to prisoners, the need to maintain institutional security in prisons is a "compelling" state interest sufficient to justify an infringement of appellant's privacy right. *See* State v. Custodio, 62 Haw. at 9, 607 P.2d at 1053.