**STATE of Tennesse, Appellee,**

v.

**Dortha Jeanne PUTT, Appellant.**

Court of Criminal Appeals of Tennessee, at Nashville.

Jan. 23, 1997.

Permission to Appeal Denied by Supreme Court Sept. 8, 1997.

Elaine B. Beeler, Asst. Public Defender, Franklin, for Appellant.

Charles W. Burson, Attorney General and Reporter, Karen M. Yacuzzo, Asst. Attorney General, Nashville, Joseph D. Baugh, District Attorney General, Ronald L. Davis, Asst. District Attorney General, Franklin, for Appellee.

## *OPINION*

PEAY, Judge.

The defendant was indicted by presentment on November 7, 1994, for introduction of contraband into a penal institution, possession of a controlled substance in a penal institution, and possession of a controlled substance for resale. She pled guilty to possession of a controlled substance in a penal institution, a Class C felony. She was sentenced as a Range I standard offender and received a three year sentence. All but forty-five days of the sentence was suspended with the remainder to be served under supervised probation. In addition, she received a two thousand dollar ($2000) fine. Prior to entering the plea, the defendant reserved the following certified questions of law for appellate review:

1) Whether the stop and search of defendant's car violated defendant's constitutional rights guaranteed by the Fourth

Amendment to the Constitution of the United States and Section 7 of Article 1 of the Constitution of Tennessee and the arrest, evidence and statements obtained therefrom be suppressed?

2) Whether the court should have refused to allow the motion to suppress to be heard?

After a review of the record and applicable law, we find that the defendant's constitutional rights were not violated and that the trial court was correct in refusing to hear the second motion to suppress.

On August 21, 1994, the defendant went to Turney Center to visit her incarcerated husband. Upon arriving at the facility, her car was searched and marijuana and drug paraphernalia were found. After being indicted, she moved to suppress the evidence discovered by the search. An evidentiary hearing on her motion was held and the following relevant facts were developed.

On the day of the defendant's visit to Turney Center, officers from the Twenty–First Judicial Drug Task Force were present and were searching all incoming vehicles. The task force was there at the request of Ricky Bell, the warden at that time. Bell testified at the suppression hearing that drugs, particularly marijuana, had become a problem in the facility causing stabbings and other general violence among the inmates. While all visitors must be frisked and must pass through a metal detector, drugs were nonetheless being brought into the facility. Because at least reasonable suspicion is needed before conducting body cavity searches, Bell and his staff did not often conduct these searches. Thus, Bell suspected that this was the manner used to smuggle drugs into the prison.

In an effort to prevent narcotics from entering the facility, the task force was asked to search all vehicles that entered the Turney Center grounds. Regulations governing the Tennessee Department of Correction (TDOC) did not allow Bell and his staff to perform these vehicle searches. Department regulations provided that TDOC employees may not conduct any forcible searches and that any visitor who refuses to submit to any search shall be denied admittance to the facility and shall be asked to leave. Furthermore, the regulations stated that any visitor who refuses to submit to a search shall not be detained. Because these regulations prevented TDOC employees from actually confronting individuals or forcing searches, Bell asked the task force to conduct the searches. Task force officers have the power to arrest while TDOC employees do not.

Turney Center is located at the dead end of Highway 299. About one-quarter of a mile before reaching the facility a sign posted on the left side of the road states: "ALL PERSONS AND VEHICLES ARE SUBJECT TO SEARCH. FIREARMS, WEAPONS, DRUGS AND ALCOHOL PROHIBITED. VIOLATORS WILL BE PROSECUTED." The defendant had visited her husband approximately fifty times between February 1994 and the day of the search.

On the day of the search, the defendant pulled into the parking area of Turney Center and stopped in the upper lot. An employee of Turney Center, who was directing cars to the lower lot to be searched, advised the defendant to remain in her car and drive to the search location. Upon realizing that vehicle searches were taking place, the defendant told the employee that she was sick and needed to leave. At this same time, Agent Joey Kimball, of the drug task force, came toward the defendant's vehicle. As he approached the vehicle, he detected a strong odor of men's cologne. At the suppression hearing, Kimball testified that cologne is often used to cover the smell of marijuana and prevent a drug dog from detecting the presence of the drug.

Kimball told the defendant that she must participate in the search and instructed her to drive her vehicle to the lower lot for inspection. The defendant did as instructed. A drug dog entered the vehicle but did not indicate the presence of marijuana. Kimball then entered the car and saw a workshop vise in plain view on the front floorboard. Upon further inspection, he found a cigar box wrapped in a plastic bag. The box contained five plastic bags with approximately one-quarter ounce of marijuana and four cylinder

shaped pellets that contained compressed marijuana. Kimball testified that the vise was the type commonly used to compress marijuana or other drugs into capsules that could be inserted into body cavities.

Later that day Agent Kimball took the defendant to the Hickman County jail where she was read her *Miranda* rights. After stating that she understood her rights, the defendant said that she had been using the vise to compress marijuana so that she could smuggle the drug into the prison by concealing it in her body cavities. She also explained that the piece of paper found in her purse was a list of inmates who owed her money for the marijuana.

The defendant did not testify at the suppression hearing nor did she offer any evidence to contradict the State's witnesses. The trial court denied the motion to suppress and in its denial included findings of facts as well as conclusions of law. The findings of a trial judge on factual issues in a suppression hearing will be upheld unless the evidence preponderates otherwise. *State v. Odom,* 928 S.W.2d 18, 23 (Tenn.1996). We find no reason to disturb the factual findings of the trial judge.

In its conclusions of law, the trial court cited alternative reasons for denying the motion to suppress. In what appears to be an issue of first impression, the trial court determined that "there is an exception to the search warrant requirement of the Fourth Amendment as applied to the searching of prison visitor vehicles." In the alternative, the court found that the defendant had not been "stopped" and that Agent Kimball had adequate reasonable suspicion to continue to observe the defendant. The court reasoned that Agent Kimball's reasonable suspicion became probable cause when he detected the heavy cologne, and thus, the search was constitutionally valid. We agree with the trial court on the first alternative ground only.

We first turn to the question of whether there was in fact any stop or seizure of the defendant when she was told she must take part in the search activities. Apparently, the defendant pulled into the upper parking lot of the facility and stopped upon noticing that all vehicles were being searched. When she stopped, a TDOC officer approached her and advised her to remain in her car and drive to the lower lot where the searches were taking place.[1] This activity in itself cannot be considered a "stop." The defendant had already brought her car to a stop, and the TDOC employee simply approached her stopped car. *See State v. Moore,* 776 S.W.2d 933, 935 (Tenn.1989). However, the analysis does not end here; we must next determine whether the defendant was later "seized."

In *Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968), the Supreme Court observed that "[i]t must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." This is so even if the purpose of the stop is limited and the detention is brief. *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1395–96, 59 L.Ed.2d 660 (1979). The test to be applied is whether, in view of all the circumstances, a reasonable person would have believed that he was not free to leave. *INS v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984). In this case, the defendant indicated her desire to leave and was told by a TDOC officer and an agent of the drug task force that she could not do so and that she must participate in the vehicle searches. She could not simply drive away because Turney Center is located on a dead end and because the agent and the TDOC employee had instructed her not to do so. The defendant was clearly not free to leave, and was, thus, "seized" within the meaning of *Terry* and its progeny.

Having determined that the defendant was "seized," the next question is

---

1. The defendant argues that the search and seizure violated Turney Center's internal regulations because the regulations provide that TDOC employees are not to perform forcible searches or to detain any prison visitor who refuses to submit to a search. While these regulations appear to pertain only to TDOC employees and not to agents with the drug task force, the violation of an administrative rule does not implicate any Fourth Amendment right. *Long v. Norris,* 929 F.2d 1111, 1115 (6th Cir.1991).

whether the seizure and the search complied with both state and federal constitutional prohibitions against "unreasonable searches and seizures." We need not consider the appropriateness of the seizure as a distinct matter from that of the search because the search itself was undertaken without a warrant, probable cause, or any level of suspicion on the part of the TDOC employee or the drug task force agent. Thus, the search was undertaken with no more justification than the less intrusive seizure. *See People v. Turnbeaugh,* 116 Ill.App.3d 199, 71 Ill.Dec. 862, 864–65, 451 N.E.2d 1016, 1018–19 (1983).

In general, the Fourth Amendment requires probable cause before an arrest is deemed to be reasonable. However, the reasonableness of measures less intrusive than a full-scale arrest is "judged by weighing the gravity of the public concern, the degree to which the seizure advances that concern, and the severity of the intrusion into individual privacy." *State v. Pulley,* 863 S.W.2d 29, 30 (Tenn.1993). *See Brown v. Texas,* 443 U.S. 47, 50–51, 99 S.Ct. 2637, 2640–41, 61 L.Ed.2d 357 (1979).

In this case, the public concern is great. Turney Center is plagued, as many correctional facilities are, with serious problems as a result of drugs being smuggled into the facility by prison visitors. The warden at the time of the defendant's arrest testified that drug smuggling had led to stabbings among the inmates as well as other general outbursts of violence. As one court has noted, "[i]t is vital that contraband articles be kept out of a prison. This is necessary for the protection of the inmates, employees of the institution and law enforcement officials assigned to that institution." *State v. Manghan,* 126 N.J.Super. 162, 313 A.2d 225, 227 (Law Div.1973). The United States Supreme Court has stated, "[a] detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence." *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). Thus, we have no trouble concluding that the first element of the reasonableness test weighs heavily in the state's favor.

The second part of the reasonableness analysis is the degree to which the search and seizure advances the public concern. In other words, the search and seizure must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879. In this case, the searches were conducted in an effort to keep drugs from being smuggled into the facility. The ordinary "frisk" search of visitors had proven unsuccessful in accomplishing this purpose, thus, officials at Turney Center opted for a different approach through the vehicle searches. Apparently, Tennessee has not yet addressed the issue of whether these type of searches are reasonably related to the goal of keeping drugs from entering the prison. Turning to federal courts and courts of other states, we find differing opinions.

In *Spear v. Sowders,* a section 1983 claim, the Sixth Circuit Court of Appeals noted that the Constitution does not require "individualized suspicion to search a car on prison grounds, particularly if the visitor has been warned that the car is subject to search." 71 F.3d 626, 633 (6th Cir.1995). In *Spear,* the plaintiff sued prison officials after she was subjected to a strip search and a vehicle search while visiting a prison inmate. The court stated that prison visitor searches fall into a special category which eliminates the need for probable cause before conducting every search of a prison visitor. The court recognized that while such a lower standard is inappropriate for a strip or body cavity search, the nature of a vehicle search is less intrusive and, therefore, is an appropriate time to apply the lower standard.

The court further stated, "We cannot say that [the plaintiff] had a clearly established right to enter a prison facility with a sign notifying her that her car would be searched, place her car in an area to which prisoners have access, enter the prison facility and then turn around and seek to leave without submitting to a search. Nor can we even say that the search of her car absent any suspicion was per se unreasonable." *Spear,* 71 F.3d at 633. *Spear* reached the court as a result of summary judgment having been granted in the defendant's favor. Because

the court found genuine issues of material fact, the case was remanded for resolution as to whether a warning sign was actually in place, whether prisoners actually had access to the parking lot, and whether the vehicle search was actually lengthy and intrusive. These questions of fact barred the Sixth Circuit from making a determination as to whether this particular search could withstand constitutional scrutiny. Nonetheless, the analysis used by the court is helpful to our determination in the present case.

In *Romo v. Champion*, also a section 1983 case, the Fifth Circuit Court of Appeals reached a similar result. 46 F.3d 1013 (10th Cir.1995). In *Romo*, the plaintiffs were stopped at a roadblock near the entrance of a correctional facility. They were asked to remain in their car while a drug dog sniffed for evidence of drugs. Marijuana was subsequently located on one of the plaintiffs. They later brought suit against prison officials claiming that the initial stop at the roadblock was an unconstitutional seizure and that the canine sniff was an unconstitutional search.

In holding that the seizure was not unconstitutional, the court applied the reasonableness test and determined that "[t]he public interest in keeping drugs out of prisons and maintaining prison security is substantial, the roadblock was reasonably tailored to achieve these objectives, and the interference with plaintiffs' individual liberty was not significant." *Romo*, 46 F.3d at 1016. Analyzing the search, the court observed that probable cause is not needed to conduct a search when "special needs" beyond those of normal law enforcement are present. It concluded that the operation of a prison presents a special needs situation that may justify a departure from the normal requirements of the Fourth Amendment. *Romo*, 46 F.3d at 1017. Thus, the court held that the search of the vehicle did not violate the plaintiffs' constitutional rights. In reaching this decision, the court pointed to these three factors: "First, because they were visiting a prison, plaintiffs' expectations of privacy were 'diminished by the exigencies of prison security.' ... Second, ... the governmental objectives in conducting the search were substantial.... Third, ... prison authorities must be afforded wide-ranging discretion in adopting policies designed to preserve institutional security." *Romo*, 46 F.3d at 1018 (citations omitted).

A third case, *People v. Turnbeaugh*, 116 Ill.App.3d 199, 71 Ill.Dec. 862, 451 N.E.2d 1016 (1983), also addresses this issue and is the primary authority for the trial court's determination in the case *sub judice*. In *Turnbeaugh*, the defendant's vehicle was searched after he was stopped by a prison official on the access road to the correctional facility. The defendant had already passed a sign warning him that all persons and vehicles were subject to being searched. His car was stopped not because of any individualized suspicion but rather because all cars coming into the prison that day were being searched. The defendant was arrested when officers found a bag of cannabis between the seats of the car. *Turnbeaugh*, 71 Ill.Dec. at 864, 451 N.E.2d at 1018.

In *Turnbeaugh*, the court also applied the reasonableness test and concluded that neither the stop nor the search of the defendant's vehicle was unconstitutional. In support of this decision, the court pointed to the legitimate governmental interest in keeping contraband out of penal institutions, to the fact that the group being searched was "self-selected" in that only those traveling to the prison were being searched, and to the sign warning that vehicles were subject to search. *Turnbeaugh*, 71 Ill.Dec. at 865, 451 N.E.2d at 1019.

Because there is no Tennessee law governing this issue, we look to the aforementioned cases for guidance in determining whether the search and seizure was reasonably related to the circumstances which justified the interference in the first place. The clear purpose of the vehicle searches was to prevent visitors from smuggling drugs into the prison. The balancing test requires us to determine whether this governmental interest outweighs the intrusion on the defendant's privacy interests. In analyzing this issue, we find several factors, similar to those in *Romo*, which are particularly significant. First, because the defendant was entering a correctional facility, she had a lesser expecta-

tion of privacy. *Blackburn v. Snow,* 771 F.2d 556, 563 (1st Cir.1985). The intrusion on her privacy is certainly less intrusive in this situation than had the search been conducted outside the confines of a correctional facility. In addition, a sign posted outside the prison grounds warned the defendant that she and her vehicle were subject to search. Second, as we noted earlier, the state has a substantial interest in keeping drugs out of prisons. And third, searching all incoming cars was a sufficiently reasonable method of preventing drugs from entering the facility. Turney Center's warden at the time testified that "frisk" searches alone were not adequate methods of prevention. Additionally, he testified that a select group of prisoners has access to the visitor parking lot during non-visitation hours. While no inmate is allowed in the parking lot while visitors are present, it is hardly a stretch to imagine a visitor leaving a contraband item in the parking lot for an inmate to recover at a later time. Thus, weighing the important state interest against the intrusion upon the defendant in this case, we conclude that both the seizure and the search were reasonable under the second prong of the reasonableness test.

■ The third and final part of the reasonableness analysis is the severity of the intrusion into individual privacy. The United States Supreme Court has observed that any search of an automobile is a "substantial" invasion of privacy. *United States v. Ortiz,* 422 U.S. 891, 896, 95 S.Ct. 2585, 2588–89, 45 L.Ed.2d 623 (1975). However, as we noted above, the fact that the defendant had entered the grounds of the prison facility diminishes her usual expectation of privacy. This intrusion on her privacy is outweighed by the state's substantial interest in preventing the introduction of drugs into prison facilities. We take this opportunity to note that had the defendant been subjected to a strip search or a body cavity search, our analysis would not be the same. A reasonable suspicion standard generally applies to these types of searches and nothing in this opinion shall be construed to hold otherwise. *See, e.g., Spear v. Sowders,* 71 F.3d 626 (6th Cir.1995); *Cochrane v. Quattrocchi,* 949 F.2d 11 (1st Cir.1991); *Daugherty v. Campbell,*

935 F.2d 780 (6th Cir.1991); *Thorne v. Jones,* 765 F.2d 1270 (5th Cir.1985). Here, however, the search of the defendant's vehicle is a "far cry" from the embarrassing and humiliating experience of a strip search. *See Romo,* 46 F.3d at 1019.

Our analysis under the reasonableness test, therefore, leads us to the conclusion that the vehicle search in this case was constitutional under the state and federal constitutions despite the fact that it was conducted without a warrant, probable cause, or reasonable suspicion.

■ Having reached this conclusion, we have one other issue to address. The defendant claims that despite whether prison officials may conduct vehicle searches without a warrant or probable cause, her constitutional rights were violated when she asked to leave and was told that she could not. The *Turnbeaugh* defendant made a similar argument by contending that once he was stopped he should have been given the opportunity either to consent to the search or to leave. He apparently did not consent to the search but he did not ask to leave either. The court rejected this argument stating that "[a]n option to depart rather than be searched would constitute a one-way street for the benefit of the party planning mischief, as there is no guarantee that he would not return later and be more successful." *Turnbeaugh,* 71 Ill. Dec. at 865, 451 N.E.2d at 1019, *citing State v. Manghan,* 126 N.J.Super. 162, 313 A.2d 225, 228–29 (Law Div.1973). The trial court in the case *sub judice* also used this language to reject the defendant's argument.

However, in a similar case, a Maryland court held that the detention of a prison visitor who had asked to leave rather than be searched was unreasonable. *Gadson v. State,* 341 Md. 1, 668 A.2d 22 (1995). In *Gadson,* the defendant was stopped and his vehicle was searched at a guard station about one-quarter of a mile from the prison. The court noted that the purpose for the vehicle searches was to prevent drugs from entering the correctional facility. When the defendant offered to turn around and leave, the goal of the searches had been fulfilled. *Gadson,* 668 A.2d at 30. The defendant should

have been further detained only if the guard who stopped him had reasonable, articulable suspicion that there were drugs in the vehicle. *See* Wayne R. Lafave, Search and Seizure § 10.7(b) (3rd ed. 1996) ("A search without probable cause of a jail visitor is justified only by the need to prevent the introduction of contraband and weapons into the jail, and this is accomplished if the person declines to be searched and departs. Should he return on another day, he will again be subject to a search of sufficient intensity to meet the danger, and thus the failure to apprehend him earlier does not jeopardize the security of the detention facility."). *See also People v. Whisnant,* 103 Mich.App. 772, 303 N.W.2d 887, 891 (1981) ("Random pat-down searches of prison visitors are reasonable where the visitor is aware of the possibility of the search and can avoid it by choosing not to proceed with the prison visit."); *Commonwealth v. Dugger,* 506 Pa. 537, 486 A.2d 382 (1985) ("A visitor comes to a prison voluntarily. If he or she refuses to be searched they may leave.").

In this case before us, the warden at the time testified that the presence of drugs was a problem at Turney Center in large part due to visitors bringing drugs into the facility by concealing the contraband in body cavities. The simple "frisk" search of all visitors did not allow detection of the drugs. In an effort to stop the drug trafficking, the warden thought that vehicle searches were necessary. Had the defendant been allowed to leave the prison grounds without being searched, she could have easily removed the drug paraphernalia from her vehicle, inserted the capsules with the compressed marijuana, and returned to the facility. A search of her vehicle would have revealed nothing, leaving the defendant free to pass the drugs to her incarcerated husband. Or, if the defendant did not return that day, she would certainly be wiser the next time she chose to visit and would not arrive at the facility with the tools of her trade in the vehicle. Additionally, vehicle searches at Turney Center are not everyday occurrences. If the defendant had been allowed to leave, she may be luckier at her next visit and choose a day that the drug task force is absent. There is no guarantee that she will be subject to a search of "suffi-cient intensity" at her next visit. And again, we point out the fact that prison inmates have access to this parking area. Thus, in this situation, the failure to apprehend the defendant at the first chance certainly does jeopardize the security of Turney Center. For these reasons, we choose to follow the reasoning of the *Turnbeaugh* court and hold that detaining the defendant after she requested to leave was not a violation of her constitutional rights.

In summary, we hold that the search of the defendant's vehicle was reasonable under the Fourth Amendment to the United States Constitution and under Article 1, Section 7 of the Tennessee Constitution despite the absence of a warrant, probable cause, or reasonable suspicion. We further hold that the denial of defendant's request to leave was not a violation of her constitutional rights. Thus, we affirm the trial court's decision that the evidence discovered as a result of the vehicle search should not be suppressed.

■■■ In her second certified question, the defendant challenges the appropriateness of the court's refusal to hear her second motion to suppress. The Rules of Criminal Procedure provide that motions to suppress must be raised prior to trial. Tenn.R.Crim.P. 12(b)(3). The rules further provide that the trial court may set a time for the making of pretrial motions unless a local rule provides otherwise. Tenn.R.Crim.P. 12(c). Hickman County Local Criminal Rule 2, section 2.01 provides that motions to suppress evidence must be filed within ten days of the date the State has complied with a defendant's discovery request.

In this case, the State filed its compliance with the discovery request on December 19, 1994. The defendant did not file her first motion to suppress until January 11, 1995. She then filed an amendment to the first motion on April 12, 1995. A hearing on the amended motion was held on April 18, 1995, and an order denying the motion was entered on May 15, 1995. Then on October 12, 1995, the defendant filed a second motion to suppress. The trial court granted the State's motion to strike this second motion because it was untimely. We find no error in the

trial court's decision. The trial court had already allowed the defendant to file her first motion past the ten day deadline and had then allowed her to amend the motion nearly three months later. We find that the defendant had ample time and opportunity to file her motion to suppress.

That the defendant's issue raised in the second motion to dismiss is a constitutional issue involving due process rights at the time of her arrest is immaterial. As this Court has stated before in defending deadlines for filing motions to suppress, "The rule does not deny anyone of his constitutional rights; it merely provides for an orderly procedure to be followed to invoke the exclusionary rule when a constitutional right is violated. Provisions are made for a defendant who has good cause for not filing his motion pretrial.... [W]e reject [the defendant's] insistence that the rule is not applicable when a violation of a constitutional right is claimed." *State v. Foote,* 631 S.W.2d 470, 473 (Tenn. Crim.App.1982). Thus, the defendant's second certified question is without merit.

For the foregoing reasons, the judgment below is affirmed.

WELLES and SMITH, JJ., concur.